UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NADINE MCKENZIE, individually; as parent,   :
legal guardian and natural guardian of Plaintiff's   :
decedent SHAMOYA MCKENZIE; and, as   :
Administratrix of the Estate of Plaintiff's   :
decedent SHAMOYA MCKENZIE,   :   **<u>OPINION AND ORDER</u>**
                 Plaintiff,   :
   :
   :   18 CV 603 (VB)
v.   :
   :
THE CITY OF MOUNT VERNON; THE CITY   :
OF MOUNT VERNON POLICE   :
DEPARTMENT; THE EMERGENCY   :
MEDICAL SERVICES OF THE CITY OF   :
MOUNT VERNON; EMPRESS AMBULANCE   :
SERVICES, INC.; DAVID HARDY; MARQUIS   :
COLLIER; JERMAINE HUGHLEY; SINCERE   :
SAVOY; and "JOHN DOES" and "JANE   :
DOES," names being fictitious intended to be   :
first responders, police, police   :
employees/personnel/officers of the City of   :
Mount Vernon, emergency medical service staff,   :
emergency medical service personnel,   :
administration, emergency medical service   :
administration personnel of the City of Mount   :
Vernon, The City of Mount Vernon Police   :
Department, and Empress Medical Services,   :
                 Defendants.   :
------------------------------------------------------------x

Briccetti, J.:

     Plaintiff[1] brings the following claims under 42 U.S.C. § 1983:

- Unlawful detention in violation of the Fourth and Fourteenth Amendments against the City of Mount Vernon (the "City"), the City Police Department, and unidentified City police officers (the "City Officers") (collectively, the "City Defendants");

---

[1]     Plaintiff Nadine McKenzie brings claims on behalf of herself and as representative of her daughter's estate.  For ease of reference, the Court refers to Nadine McKenzie as "plaintiff," and, where appropriate, specifies the causes of action for which plaintiff brings claims on behalf of her daughter's estate.

- Infringement of plaintiff's right to intimate association in violation of the Fifth and Fourteenth Amendments against the City Defendants;

- A claim titled "Caused to be Subjected" against the City and the City Police Department;

- Conspiracy against the City Defendants;

- Supervisory liability against the City and the City Police Department; and

- A claim pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), against the City Defendants.

In addition, plaintiff asserts several state law claims against the City Defendants; the Emergency Medical Services of the City of Mount Vernon ("EMS"); Empress Ambulance Services, Inc. ("Empress Ambulance"); individual defendants David Hardy, Marquis Collier, Jermaine Hughley, and Sincere Savoy; and unidentified John and Jane Does.

Now pending is the City Defendants' and EMS's motion to dismiss the amended complaint pursuant to Rule 12(b)(6) and to strike the amended complaint pursuant to Rule 12(f). (Doc. #38).[2]

For the following reasons, the motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to strike is DENIED.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint, and draws all reasonable inferences in plaintiff's favor, as summarized below.

---

[2] Empress Ambulance has answered the amended complaint. The individual defendants Hardy, Collier, Hughley, and Savoy have not answered and appear to be in default. Plaintiff has not sought default judgments against the individual defendants.

On December 31, 2016, at approximately 2:30 p.m., plaintiff picked up her daughter from basketball practice at Mount Vernon Junior High School to drive her home. As they were driving, plaintiff's daughter—who was sitting in the front seat of the vehicle—was shot in the head by a stray bullet fired by defendant David Hardy.

Plaintiff alleges that she called 911 and that "cousins of Plaintiff's decedent . . . , and/or . . . others at the scene" also called 911. (Am. Compl." ¶¶ 36-37). Someone then informed plaintiff that the 911 operator said EMS would be there "immediately and/or in short time." (Id. ¶ 38).

EMS was taking a long time, so plaintiff considered driving her daughter to the hospital herself. A police officer then arrived; plaintiff asked the officer if he could provide her with a police escort to drive her daughter to the hospital. The officer said that was unnecessary because EMS would be there shortly.

Other police officers arrived on the scene and began to question plaintiff about the shooting. They also searched plaintiff's vehicle. Plaintiff provided what little information she had—that she had seen someone in a gray sweatshirt running and did not see his face—and tried to assure the officers that she and her daughter were innocent bystanders.

Plaintiff pleaded with the officers to let her be with her daughter, who was still in the vehicle, and to let her drive her daughter to the hospital. Instead, the officers surrounded plaintiff, said "you must come with us," and took plaintiff two blocks away to where plaintiff had seen the individual in the gray sweatshirt. (Am. Compl. ¶ 60). The officers told plaintiff another individual had been shot near that location, and wanted to bring her to the second victim to see if she recognized him or vice versa. Plaintiff did not recognize the individual, who was not wearing a gray sweatshirt and did not have life-threatening injuries. The individual likewise

told the officers he did not recognize plaintiff, and plaintiff had not been involved in the shooting.

Twenty minutes after the call to 911, EMS arrived. But they went to where the other victim was located, and plaintiff had to "flag down" the ambulance and direct it to her daughter. (Am. Compl. ¶ 84). The EMS technician gave the following excuses for the twenty-minute response time: (i) EMS was understaffed; (ii) EMS did not have an ambulance in Mount Vernon and EMS personnel had to travel from Yonkers; and (iii) the dispatcher had provided EMS personnel with confusing or misleading information regarding the number of shooting victims and their location.

Plaintiff wanted to ride in the ambulance to the hospital with her daughter, who was still alive but in extreme pain. Plaintiff wanted to be by her daughter's side, especially if her daughter was dying. But the officers would not let her.

The officers told plaintiff she had to go with them to the Mount Vernon Police Precinct. Plaintiff insisted she had given the officers all the information she had regarding the shooting, but the officers told plaintiff she was a suspect and they would not let her see her daughter until she told them everything she knew about the shooting.

The officers took plaintiff to the precinct and held her in what plaintiff believed was an "interrogation room." (Am. Compl. ¶ 106). One of the officers was posted at the door; that officer told plaintiff she was not allowed to leave until a detective questioned her.

Then, Andrea Hamilton, a parent of another child on the Mount Vernon Junior High School basketball team, showed up at the precinct and pleaded with the officers to allow plaintiff to be with her daughter. Ms. Hamilton told the officers, "Plaintiff and her daughter had nothing to do with the shooting, as they were in fact the victims of a crime, as Plaintiff was in fact a good

mother/person who would not be involved in criminal activities." (Am. Compl. ¶ 116). The officers still refused to release plaintiff, so Hamilton threatened to call and complain to City Councilman Andre Wallace. Only then did the officers release plaintiff.

All told, more than one hour had passed since the officers required that plaintiff accompany them to the other victim at the crime scene.

Plaintiff's daughter was still alive when she arrived at the hospital. But by the time plaintiff arrived, her daughter, tragically, had died.

## DISCUSSION

I.     Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.     City Police Department

The Court sua sponte dismisses plaintiff's claims against the City Police Department because city agencies or departments do not have the capacity to be sued under New York law. See Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities.").[3]

III.    Unlawful Detention Claim

The City Defendants argue plaintiff fails to state a claim for unlawful detention because the City Officers had reasonable suspicion to conduct an investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968).

The Court agrees regarding plaintiff's detention at the crime scene. However, the Court disagrees as to plaintiff's continuing detention to and at the police precinct.

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" U.S. Const. amend. IV.[4]

"[T]he first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir. 1998).

---

[3]     It is unclear whether EMS is a City agency or department, and therefore the Court does not dismiss EMS for lack of capacity to be sued. Nonetheless, as explained below, all claims against EMS are dismissed.

[4]     To the extent plaintiff's unlawful detention claim asserts both false arrest and false imprisonment, "they are considered synonymous causes of action" and thus the Court analyzes them together. Little v. City of New York, 487 F. Supp. 2d 426, 437 (S.D.N.Y. 2007) (citing Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)).

A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not at liberty to leave. United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. However, "mere police questioning does not constitute a seizure." Muehler v. Mena, 544 U.S. 93, 101 (2005) (internal quotation omitted).

If there was a seizure, the Court proceeds to the second step, which is to determine what type of seizure occurred. There are two relevant types of seizures, each of which requires a different level of justification: (i) an investigatory (or Terry) stop, which must be based on "a reasonable suspicion supported by articulable facts that criminal activity may be afoot"; and (ii) an arrest, which must be based on probable cause. United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "Whether a seizure is an arrest or a merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." Posr v. Doherty, 944 F.2d at 98 (internal citations omitted). "As the level of intrusiveness rises, . . . an encounter between the police and a citizen is more properly categorized as an arrest." Id.

"A permissible investigative stop may become an unlawful arrest if the means of detention are more intrusive than necessary." United States v. Wiggan, 530 F. App'x 51, 55 (2d Cir. 2013) (summary order) (internal quotation omitted). Thus:

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents

7

> involved, whether the target of the stop was suspected of being armed, the
> duration of the stop, and the physical treatment of the suspect, including whether
> or not handcuffs were used."

Id. (internal citation omitted). "[I]n some circumstances, police may transport a suspect short distances in aid of a Terry stop," including "to transport [a suspect] to the crime scene to see whether he could be identified by the victim." United States v. McCargo, 464 F.3d 192, 198 (2d Cir. 2006) (internal citations omitted). However, when officers "detain a suspect and then transport him for extended questioning at the station house," the officers may pass the bounds of a permissible Terry stop. Ozga v. Elliot, 150 F. Supp. 3d 178, 192 (D. Conn. 2015).

The third and final step is to determine whether the seizure was justified—in other words, whether the officers had reasonable suspicion (if the seizure was an investigatory stop) or probable cause (if the seizure was an arrest). See Posr v. Doherty, 944 F.2d at 98. In reviewing whether the officers had reasonable suspicion, "courts evaluate the circumstances surrounding the stop through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Padilla, 548 F.3d 179, 187 (2d Cir. 2008) (internal quotation omitted). "Even conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." Id. (internal quotation omitted).

In contrast, probable cause exists if an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation omitted). "Probable cause does not require absolute certainty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003). Indeed, "some exculpatory evidence does

not make an arrest illegal when the totality of evidence still establishes probable cause to believe that the suspect committed the crime." <u>Stansbury v. Wertman</u>, 721 F.3d 84, 94 (2d Cir. 2013).

Here, accepting the allegations of the amended complaint as true, the City Officers' initial detention of plaintiff was a <u>Terry</u> stop requiring reasonable suspicion because the officers told plaintiff she must go with them and surrounded her. However, based on the facts as alleged, the <u>Terry</u> stop was permissible because the officers had reasonable suspicion to detain plaintiff— a double shooting had just occurred in plaintiff's vicinity. Any reasonable police officer would have detained eyewitnesses to gather information and to protect the surrounding community. Further, at this point, the stop had not ripened into an arrest and therefore did not require probable cause. According to the amended complaint, the officers moved plaintiff only a short distance—two blocks—to where another victim had been shot, to see if plaintiff and the other victim recognized each other. It was also for a relatively short time—approximately twenty minutes.

But when the officers required plaintiff to go with them to the precinct, the detention as alleged became a <u>de facto</u> arrest. According to the amended complaint, the officers told plaintiff she was a suspect, had to go with them, and that they would not let plaintiff see her daughter until she told them everything she knew about the shooting. At the precinct, the officers allegedly posted an officer outside the room in which plaintiff was being held and told plaintiff she was not permitted to leave until a detective questioned her about the shooting.

Further, the arrest was not supported by probable cause. There are no facts alleged in the amended complaint indicating plaintiff was anything more than the victim of horrible circumstances. On the other hand, as alleged, multiple facts in the amended complaint indicate

plaintiff was innocent:  the second shooting victim did not recognize plaintiff and it was plaintiff's own daughter who had been shot.

Accordingly, plaintiff sufficiently alleges an unlawful detention claim.[5]

IV.  Right to Intimate Association Claim

Plaintiff asserts a claim against the City Defendants for infringement of her right to intimate association.[6]  The City Officers argue they are entitled to qualified immunity.[7]

The Court agrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  "Defendants bear the burden of establishing qualified immunity."  Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).  "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion

---

[5]     An officer is entitled to qualified immunity on a claim for false arrest when the officer has arguable probable cause for the arrest.  Arrington v. City of New York, 628 F. App'x 46, 49 (2d Cir. 2015) (summary order).  Here, however, the City Officers do not assert they had arguable probable cause to arrest plaintiff; the City Officers only argue the officers were entitled to qualified immunity because they had arguable reasonable suspicion for an investigatory stop.  Thus, the Court does not address whether the City Officers had arguable probable cause entitling them to qualified immunity for arresting plaintiff.

[6]     Plaintiff pleaded infringement of her right to travel as part of her claim for infringement of her right to intimate association.  Plaintiff does not address defendant's argument to dismiss her claim for infringement of her right to travel.  Accordingly, plaintiff's claim for infringement of her right to travel is deemed abandoned.  See M.M. ex rel. J.M. v. N.Y.C. Dep't of Educ., 2010 WL 2985477, at *6 (S.D.N.Y. July 27, 2010) (collecting cases).

[7]     The Court analyzes plaintiff's claim for infringement of her right to intimate association as against the City below with plaintiff's Monell claims.

for failure to state a claim upon which relief can be granted."  Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order).  However, "a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the facts supporting the defense appear on the face of the complaint."  Id. (internal quotations omitted).

"The issues on qualified immunity are:  (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."  Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Taravella v. Town of Wolcott, 599 F.3d 129, 133–34 (2d Cir. 2010)).

"[T]he general right to intimate association has been clearly established since 1984 when [Roberts v. United States Jaycees, 468 U.S. 609, 617–18 (1984)] was decided."  Patel v. Searles, 305 F.3d 130, 139 (2d Cir. 2002).  "But qualified immunity does not turn on general propositions.  Rather, the essential question is whether, [in 2016], the [r]ight was established 'in a particularized sense so that the contours of the right [would have been] clear to a reasonable official.'"  Ranta v. City of New York, 2015 WL 5821658, at *6 (E.D.N.Y. Sept. 30, 2015) (quoting Reichle v. Howards, 566 U.S. 658, 665 (2012)).

On December 6, 2018, the Second Circuit held that "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship."  Gorman v. Rensselaer County, 2018 WL 6367243, at *5 (2d Cir. Dec. 6, 2018).  But on December 31, 2016, when this incident occurred, Second Circuit law on the issue—"whether intentional interference with the familial relationship is necessary to make out a constitutional claim of deprivation of the right to

familial association"—was not clearly established.  Cruz v. City of New Rochelle, 2017 WL 1402122, at *28 (S.D.N.Y. Apr. 3, 2017) (internal citations omitted).

Plaintiff has not alleged any facts suggesting the City Officers intentionally interfered with plaintiff's relationship with her daughter.  Therefore, the City Officers' alleged misconduct does not fall within the category of behavior that clearly violated plaintiff's rights.

Accordingly, the City Officers are entitled to qualified immunity on plaintiff's claim for infringement of her right to intimate association.

V.      "Caused to be Subjected" Claim

Plaintiff's "Caused to be Subjected" claim is duplicative of plaintiff's other Section 1983 claims and is not cognizable as a standalone Section 1983 claim.  It is therefore dismissed.  See, e.g., Graham v. Connor, 490 U.S. 386, 393–94 (1989) ("[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred (internal quotation omitted)).

VI.     Conspiracy Claim

Plaintiff's conspiracy claim against the City Defendants fails because the City Defendants are "officers, agents and employees of a single corporate entity," and are thus "legally incapable of conspiring together."  Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation omitted).

The Court rejects plaintiff's argument that Section 1983 conspiracy claims are not subject to the intracorporate conspiracy doctrine.  See Down v. DeMarco, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018) ("Although the Second Circuit has not yet expressly held this doctrine applicable to Section 1983 suits, as it has for 42 U.S.C. § 1985, courts in this district have uniformly applied the rule to Section 1983 cases as well." (internal citations omitted)).

Accordingly, plaintiff's conspiracy claim is dismissed.

## VII. Monell Claims

Plaintiff's Monell claims fail because plaintiff fails to allege a causal connection between a policy and custom and the deprivation of a constitutional right.[8]

Under Monell, a municipality is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." Monell v. Dep't of Soc. Servs., 436 U.S. at 694. Thus, to assert a Section 1983 claim against the City, plaintiff must allege the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. See Jones v. Town of E. Haven, 691 F.3d 72, 80 (2d Cir. 2012).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following: (i) "a formal policy officially endorsed by the municipality"; (ii) "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question"; (iii) "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware"; or (iv) "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those

---

[8]    To the extent plaintiff asserts Monell claims against the City Officers in their official capacities, those claims are deemed brought against the City itself. See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) (internal citation omitted). In addition, plaintiff's supervisory liability claim against the City is analyzed together with plaintiff's Monell claim. See Trujillo v. City of New York, 2016 WL 10703308, at *8 (S.D.N.Y. Mar. 29, 2016) ("[C]laims of supervisory liability under Section 1983 alleged against a municipality are analyzed under Monell." (internal quotation omitted)), aff'd, 696 F. App'x 560 (2d Cir. 2017) (summary order).

who come into contact with the municipal employees." Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of [Bell Atlantic Corp. v. Twombly, 550 U.S. at 572], and [Ashcroft v. Iqbal, 556 U.S. at 678]." Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. Sept. 13, 2013) (citing Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id. at *3 (internal quotation omitted). "The allegations that [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." Missel v. Cty. of Monroe, 351 F. App'x 543, 545–46 (2d Cir. 2009) (summary order) (citing Dwares v. City of New York, 985 F.2d 94, 100–02 (2d Cir. 1993)).

Plaintiff essentially alleges the City Police Department had policies or customs of underfinancing, mismanagement, and failure adequately to train and staff police officers, which plaintiff believes allowed the tragic shooting of her daughter to occur. But plaintiff does not allege any facts suggesting a policy or custom that led to her alleged unlawful detention or infringement of the right to familial association. Therefore, plaintiff fails sufficiently to allege a causal connection between a policy or custom and the alleged underlying constitutional violations.

Accordingly, plaintiff's Monell claims are dismissed.

VIII.   State Law Claims

As relevant to the instant motion, plaintiff brings two state law negligence claims against the City Defendants, EMS, and Empress Ambulance—one on behalf of plaintiff and one on

behalf of plaintiff's daughter—and claims for negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED") against all defendants. In addition, plaintiff brings three categories of state law derivative claims, including: (i) wrongful death against the City Defendants, EMS, and Empress Ambulance; (ii) conscious pain and suffering against all defendants; and (iii) loss of consortium against all defendants.

First, plaintiff's wrongful death claims fail because plaintiff fails to allege distributees who have suffered a pecuniary loss because of plaintiff's daughter's death. See Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 398 (S.D.N.Y. 2013) (holding the mere mention of distributees in a complaint was insufficient to allege pecuniary loss).

Second, plaintiff's loss of consortium claim fails because New York does not recognize a common law cause of action for loss of consortium. Winters v. Alza Corp., 690 F. Supp. 2d 350, 354 n.4 (S.D.N.Y. 2010) (citing Liff v. Schildkrout, 49 N.Y.2d 622, 632–34 (1980)).

Third, plaintiff's remaining state law claims against the City Defendants and EMS for negligence and conscious pain and suffering fail for the reasons discussed below.

A.      Negligence

Plaintiff brings negligence claims against the City Defendants, EMS, and Empress Ambulance. The City Defendants and EMS argue plaintiff fails to state negligence claims against them because plaintiff fails plausibly to allege a special relationship with the City.

The Court agrees.

"When a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.'" Velez v. City of New York, 730 F.3d 128, 134 (2d Cir. 2013) (quoting Applewhite v. Accuhealth, Inc., 21 N.Y.3d 420, 425 (2013)).

When a municipality acts in a governmental capacity, "a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." Id. at 135 (quoting Valdez v. City of New York, 18 N.Y.3d 69, 75 (2011)).

"A municipality performs a governmental function when its acts are 'undertaken for the protection and safety of the public pursuant to the general police powers.'" Velez v. City of New York, 730 F.3d at 134–35 (quoting Sebastian v. State of New York, 93 N.Y.2d 790, 793 (1999)). "[P]ublicly-employed, front-line EMTs and other first responders, who routinely place their own safety and lives in peril in order to rescue others, surely fulfill a government function." Applewhite v. Accuhealth, Inc., 21 N.Y.3d at 428. In addition, "[p]roviding police protection has long been recognized as a quintessential governmental function." Velez v. City of New York, 730 F.3d at 135 (citing Valdez v. City of New York, 18 N.Y.3d at 75).

"If it is determined that a municipality was exercising a governmental function, the next inquiry focuses on the extent to which the municipality owed a 'special duty' to the injured party." Applewhite v. Accuhealth, Inc., 21 N.Y.3d at 426. "The core principle is that 'to sustain liability against a municipality, the duty breached must be more than that owed the public generally.'" Id. (quoting Valdez v. City of New York, 18 N.Y.3d at 75). "[A] special duty can arise in three situations: (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." Id. (internal citation omitted).

For a municipality voluntarily to assume a duty to the plaintiff beyond what was owed to the public generally, four elements must be present:

> (1) an assumption by the municipality, through promises or actions, of an
> affirmative duty to act on behalf of the party who was injured; (2) knowledge on

the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

Applewhite v. Accuhealth, Inc., 21 N.Y.3d at 430–31 (internal quotation omitted).  Although the issue of whether a special relationship exists is generally a question for the jury, "courts have granted Rule 12(b)(6) motions when the plaintiff fails to allege or provide the factual predicate for a special relationship in the complaint."  Estate of Sauickie v. City of New York, 2018 WL 3222534, at *3 (S.D.N.Y. July 2, 2018) (internal citations omitted).

Here, plaintiff alleges someone—possibly plaintiff herself (though plaintiff's allegations are unclear on this point)—called 911 after her daughter was shot.  Even if plaintiff spoke to a 911 operator herself, it would not be sufficient to create a special relationship between the City and her daughter.  Plaintiff's daughter—not plaintiff herself—is the injured party.  Plaintiff's daughter did not speak to a municipal agent.  Therefore, plaintiff fails sufficiently to allege the third element necessary to create a special duty:  direct contact between the municipality's agents and the injured party.

Accordingly, plaintiff's negligence claims are dismissed.

B.      NIED and IIED

Plaintiff brings claims for NIED and IIED against all defendants.  "New York does not recognize NIED or IIED causes of action where the conduct underlying them may be addressed through traditional tort remedies, such as false arrest."  Berrio v. City of New York, 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017).

As plaintiff's claims fall within the ambit of traditional tort law—namely, negligence, assault, battery, and false arrest—plaintiff's NIED and IIED claims are dismissed.

C.    Conscious Pain and Suffering

Plaintiff's claim for conscious pain and suffering against the City Defendants and EMS depends on plaintiff's claims for negligence, NIED, and IIED, which the Court has dismissed. See, e.g., Chamberlain v. City of White Plains, 986 F. Supp. 2d at 399 (citing N.Y. Est. Powers & Trusts Law §§ 5–4.1, 11–3.2(b)).

In addition, to the extent plaintiff claims her alleged unlawful detention is an underlying wrong supporting her claim for conscious pain and suffering, that argument fails. As explained above, plaintiff only sufficiently alleges unlawful detention once the officers took her to the police precinct, which plaintiff alleges occurred after the ambulance had already arrived. Therefore, plaintiff's alleged unlawful detention could not have plausibly caused the death or further injury of plaintiff's daughter.

Accordingly, plaintiff's conscious pain and suffering claim against the City Defendants and EMS is dismissed.

IX.    Motion to Strike

The City Defendants and EMS move to strike the amended complaint for failure to provide a "short and plain statement" in compliance with Fed. R. Civ. P. 8(a)(2).

The Court is tempted to grant the City Defendants' and EMS's request. However, the Court will not prejudice plaintiff because of her attorney's inartful pleading.

Fed. R. Civ. P. 8(a)(2) states a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Court may dismiss a complaint for failure to comply with Rule 8 "by virtue of a plaintiff's including redundant or unnecessary allegations." Grimes v. Fremont General Corp., 933 F. Supp. 2d 584, 594 (S.D.N.Y. Mar. 22, 2013) (internal citation omitted). Although "[s]uch dismissal is generally 'disfavored'" id.

(internal quotation omitted), courts have dismissed pleadings in similar or less egregious circumstances to those in this case, <u>see</u> <u>id</u>. at 595 (collecting cases).

Frankly, the Court is flabbergasted at the size of the amended complaint—192 pages and 470 paragraphs.  Moreover, the amended complaint consists largely of repetitive and unnecessary statements.  Plaintiff's sloppy pleading wastes the valuable time of the Court and defense counsel, which must decipher plaintiff's inartfully pleaded allegations and claims.

Plaintiff's counsel is on notice—the Court will not entertain future submissions that so egregiously violate reasonable length limitations.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

The motion to strike is DENIED.

The remaining claims in this action are:

(i)     unlawful detention claim against the City and the unidentified City Officers;

(ii)    assault and battery and conscious pain and suffering claims against the individual defendants Hardy, Collier, Hughley, and Savoy;

(iii)   breach of contract, negligence, and conscious pain and suffering claims against Empress Ambulance; and

(iv)    punitive damages against Empress Ambulance and the individual defendants Hardy, Collier, Hughley, and Savoy.

The City of Mount Vernon shall file an answer by January 11, 2019.

The Clerk is instructed to (i) terminate the City of Mount Vernon Police Department and the Emergency Medical Services of the City of Mount Vernon from the docket, and (ii) terminate the motion.  (Doc. #38).

Dated: December 28, 2018
      White Plains, NY

                SO ORDERED:

                Vincent L. Briccetti
                United States District Judge