UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

NADINE MCKENZIE, *individually, as parent,*
*legal guardian and natural guardian of Plaintiff's*
*decedent* SHAMOYA MCKENZIE, and
*as Administratrix of the Estate of Plaintiff's*
*decedent* SHAMOYA MCKENZIE,

                Plaintiff,[1]

      -against-

DAVID HARDY, MARQUIS COLLIER,
JERMAINE HUGHLEY, and SINCERE SAVOY,

                Defendants.
-------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

18 Civ. 603 (VB) (AEK)

**TO:  THE HONORABLE VINCENT L. BRICCETTI, U.S.D.J.**

      This case involves a tragic loss of life.  Shamoya McKenzie, who was 13 years old at the time of her death, had a bright and promising future ahead of her.  On December 31, 2016, Shamoya's life was taken in a senseless act of violence, when she was struck and killed by a stray bullet while riding through Mount Vernon, New York in the front passenger seat of her mother's car.  Even though no amount of money can truly compensate for this loss, this Court has been tasked with making a recommendation as to the appropriate amount of damages to award Plaintiff Nadine McKenzie, who brings this lawsuit individually, as Shamoya's parent, legal guardian, and natural guardian, and also as administratrix of Shamoya's estate, in light of the default of Defendants David Hardy, Marquis Collier, Jermaine Hughley, and Sincere Savoy

---

[1] Nadine McKenzie is acting in two different roles in this matter—she has brought suit (i) on behalf of herself, and (ii) also as administratrix of the estate of her daughter, Shamoya McKenzie.  This Report and Recommendation uses the singular term "Plaintiff" to refer to Ms. McKenzie in both roles.

(collectively, the "Defaulting Defendants"), each of whom pled guilty to criminal acts related to Shamoya's death. *See* footnote 3, *infra*. This Report and Recommendation takes into account the applicable legal standards, the factual allegations in the operative pleading, the evidence presented at the damages inquest hearing, and the submissions by Plaintiff's counsel.

For the reasons that follow, this Court respectfully recommends that Plaintiff be awarded a total of $9,625,000, plus post-judgment interest, on her claim for Shamoya's conscious pain and suffering. This recommended award consists of: (i) $1,750,000 in compensatory damages as against all the Defaulting Defendants, jointly and severally; and (ii) $7,875,000 in punitive damages, allocated among the individual Defaulting Defendants—$2,625,000 as against Defendant Hardy, $1,750,000 as against Defendant Collier, $1,750,000 as against Defendant Hughley, and $1,750,000 as against Defendant Savoy. This Court declines to recommend an award of damages for Plaintiff's claim for wrongful death or her claim for assault and battery.

## BACKGROUND

### I.    Procedural History

Plaintiff commenced this action on January 23, 2018, *see* ECF No. 2, and filed an amended complaint on April 17, 2018, *see* ECF No. 34. Your Honor issued a decision on a motion to dismiss the amended complaint on December 28, 2018, *see* ECF No. 45, which was followed by an almost three-year stay of discovery pending the resolution of the federal criminal proceedings against the Defaulting Defendants, *see* ECF Nos. 56-77. Plaintiff filed a second amended complaint on May 13, 2022. ECF No. 85 ("Second Amended Complaint" or "Second Am. Compl.").

Plaintiff has settled her claims against the City of Mount Vernon, City of Mount Vernon Police Officers Anthony McEachin, Michael Marcucilli, and Derrick Williams, and Empress

Ambulance Services ("Empress").  *See* ECF Nos. 77, 92, 97, 98.  On October 19, 2022, Plaintiff obtained a Clerk's Certificate of Default as to Defendants Hardy, Collier, Hughley, and Savoy, *see* ECF No. 118, and subsequently moved by order to show cause for the entry of a default judgment against them, *see* ECF Nos. 119-21.  Following a show cause hearing held on January 12, 2023, at which the Defaulting Defendants failed to appear, Your Honor issued a default judgment against them as to liability only.  *See* Docket Sheet, Minute Entry dated 1/12/2023; ECF No. 134.  The matter was then referred to this Court for an inquest on damages.  ECF No. 135.

The claims in the Second Amended Complaint against the Defaulting Defendants are for (1) wrongful death and conscious pain and suffering, *see* Second Am. Compl. ¶¶ 141-53, and (2) assault and battery, *see id.* ¶¶ 154-58.[2]  This Court conducted an inquest hearing on June 9, 2023, at which Plaintiff appeared, testified, and presented evidence.  *See* ECF No. 146-1 ("Hearing Transcript" or "Hearing Tr.").  Plaintiff thereafter filed a post-hearing letter brief.  ECF No. 146 ("Pl.'s Mem.").  The Defaulting Defendants did not appear at the inquest hearing and have not filed anything in response to Plaintiff's submissions.

## II.    Factual Background

On December 31, 2016, Plaintiff was driving her car through Mount Vernon, with Shamoya sitting in the front passenger seat and Plaintiff's two cousins sitting in the back seat, when Plaintiff heard a sound that she later realized was that of a bullet piercing a window of her

---

[2] The Second Amended Complaint also includes a "claim" for punitive damages, *see* Second Am. Compl. ¶¶ 159-64, but "punitive damages" cannot be asserted as a standalone claim. *See Rocanova v. Equitable Life Assur. Soc'y of U.S.*, 83 N.Y.2d 603, 616 (1994) ("A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action . . . .").  Accordingly, this Court considers the availability of punitive damages as part of Plaintiff's remaining substantive claims.

car.  Hearing Tr. at 29:22-24, 31:4-13, 35:7-10.[3]  Shamoya fell towards Plaintiff, and Plaintiff

asked Shamoya why she was "playing around"; but then Shamoya said, "mommy," at which

point Plaintiff looked over and saw "blood start to spray out of [Shamoya's] nose and mouth."

*Id.* at 31:13-17; *see id.* at 34:12-35:2, 35:12-14 (after Plaintiff pushed Shamoya back up to a

sitting position, she cried out "mommy" a second time).  Plaintiff realized that Shamoya had

been shot and stopped the car "in the middle of the street."  *Id.* at 31:18-19.  At that point,

Plaintiff's cousins ran out of the car, and Plaintiff pulled Shamoya up to sit and started screaming

while people started arriving.  *Id.* at 31:19-23.[4]  Shamoya was gasping for air and was bleeding

heavily.  *Id.* at 35:18-20.  Her eyes were open and blinking and moving from side to side.  *Id.* at

35:22-24, 38:7-13.  Shamoya was moving her head, *id.* at 36:7-25, and she was coughing up

blood, *id.* at 37:4-8, 38:2-6.

Plaintiff testified that approximately 27 to 30 minutes elapsed from the time she realized

Shamoya had been shot until an ambulance arrived on the scene,[5] and another 5 to 7 minutes

passed before the ambulance arrived at Shamoya's location on the street.  *Id.* at 39:11-13, 40:4-

---

[3] The bullet that struck and killed Shamoya allegedly was fired by Defendant Hardy.  *See* Second Am. Compl. ¶ 48.  The Defaulting Defendants each pled guilty to federal criminal charges in connection with the shooting that caused Shamoya's death and were sentenced to terms of imprisonment ranging from 264 months to 372 months.  *See id.* ¶¶ 148-51.

[4] According to Plaintiff, bystanders had already started to gather at the scene of the shooting because multiple gunshots had been fired; Plaintiff testified that she believed it was the third gunshot that hit Shamoya.  Hearing Tr. at 31:21-23.

[5] Plaintiff testified that it took a long time for an ambulance to arrive because, according to the ambulance personnel, there were no available ambulances in Mount Vernon, and an ambulance ended up coming from Yonkers.  Hearing Tr. at 27:1-20, 39:11-15.

41:13.[6]  When the ambulance arrived to attend to Shamoya, Shamoya moved her right arm or

hand; her eyes were still open; she was still gasping for air; and she was still coughing up blood.

*Id.* at 41:14-42:22.  As the ambulance personnel pulled Shamoya out of Plaintiff's car to put her

in the ambulance, Shamoya's right hand and left foot moved.  *Id.* at 47:18-25, 48:15-21.  While

the ambulance personnel were putting Shamoya on a stretcher, her eyes were open, she was still

gasping for air and coughing up blood, and blood was still coming out of her nose.  *Id.* at 48:4-

12.  Plaintiff testified that she was then separated from her daughter, and by the time she saw

Shamoya again at the hospital, Shamoya was already dead.  *Id.* at 48:22-50:21.

    Records admitted into evidence at the inquest hearing from Empress and Montefiore

Mount Vernon Hospital ("Montefiore"), *see id.* at 3:22-4:14, 5:7-6:15, corroborate Plaintiff's

testimony that Shamoya was still alive and conscious from the time of the shooting until she was

taken out of the car and placed onto a stretcher by the ambulance personnel.  According the

Empress records, at 2:31 p.m., Shamoya was experiencing "agonal respirations," *i.e.*, gasping for

air,[7] but had "no abnormalities" in her pulses, motor function, and neurological function.

Empress Records at p. 2.  As of 2:34 p.m., however, even though Shamoya still maintained a

strong pulse despite her "labored" and "irregular" breathing, her level of consciousness was

"unresponsive," and accordingly her "pain scale" was listed as zero.  *Id.* at pp. 2, 3.  By 2:44

---

[6] Another individual had been shot in his hand.  *See* Hearing Tr. at 32:2-9.  According to
Plaintiff, when the ambulance first arrived on the scene, it went to attend to the other person until
Plaintiff redirected the ambulance to Shamoya's location.  *See id.* at 40:17-41:5.

[7] "Agonal breathing is when someone who is not getting enough oxygen is gasping for
air. . . .  It's not true breathing.  It's a natural reflex that happens when your brain is not getting
the oxygen it needs to survive.  Agonal breathing is a sign that a person is near death.  It's also a
sign that the brain is still alive."  "What to Know About Agonal Breathing," *available at*
https://www.webmd.com/heart-disease/what-to-know-agonal-breathing [https://perma.cc/TGN5-
PP9Y] (last visited Nov. 7, 2024).

p.m., the Empress records indicate that Shamoya no longer had a pulse and no longer was breathing; her level of consciousness remained "unresponsive," with a "pain scale" of zero  *Id.* at p. 3; *see id.* at p. 10.  Plaintiff estimated that it was approximately 30 to 45 minutes from the time Shamoya was shot to the time she was taken from the scene of the shooting by ambulance. Hearing Tr. at 38:19-39:6.  The Montefiore records reflect that Shamoya arrived at the hospital emergency department at 2:52 p.m. and was pronounced dead at 3:07 p.m.  Montefiore Records at p. 10.

## DISCUSSION

### I.    Legal Standard Governing Damages Inquests

"A default judgment that is entered on the well-pleaded allegations in a complaint establishes a defendant's liability, and the sole issue that remains before the court is whether the plaintiff can show, with reasonable certainty, entitlement to the amount of damages [he or she] seeks." *Trinity Biotech, Inc. v. Reidy,* 665 F. Supp. 2d 377, 380 (S.D.N.Y. 2009) (cleaned up). "When assessing damages, a court cannot rely on the plaintiff's statement of the damages; rather, damages must be established with reasonable certainty."  *Negrin v. Kalina*, No. 09-cv-6234 (LGS) (KNF), 2013 WL 6671688, at *4 (S.D.N.Y. Dec. 17, 2013) (quotation marks omitted), *adopted by* 2014 WL 67231 (S.D.N.Y. Jan. 7, 2014); *see Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  Furthermore, "even when the defendant[s] default[] and [are] not present to object, damages must be based on admissible evidence."  *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010) (summary order).

## II.  Application of Legal Standard

Since Your Honor already granted a default judgment as to the Defaulting Defendants'

liability, the only issue to be decided is the amount of damages that Plaintiff may recover on her

remaining claims against them.

### A.  Wrongful Death and Conscious Pain and Suffering

As a threshold matter, it is not clear whether Your Honor's default judgment as to

liability included a determination as to Plaintiff's purported claim against the Defaulting

Defendants for wrongful death.  Plaintiff's first amended complaint included, as the seventh

cause of action, a claim for "wrongful death," and as the eighth cause of action, a claim for

"wrongful death and conscious pain and suffering," against the City of Mount Vernon, the City

of Mount Vernon Police Department, the emergency medical services of the City of Mount

Vernon, Empress, and various John and Jane Does.  *See* ECF No. 34-2 ¶¶ 339-56 (seventh cause

of action), 357-81 (eighth cause of action).  The ninth cause of action in the first amended

complaint alleged a claim for "wrongful death and conscious pain and suffering" against the

Defaulting Defendants.  *See id.* ¶¶ 382-91.

In an opinion and order granting in part and denying in part the motion to dismiss filed by

certain defendants, Your Honor dismissed Plaintiff's claims for wrongful death.  *See* ECF No. 45

("Opinion and Order") at 14-15.  Your Honor determined that "plaintiff's wrongful death claims

fail because plaintiff fails to allege distributees who have suffered a pecuniary loss because of

plaintiff's daughter's death."  *Id.* at 15.  The claim for "wrongful death and conscious pain and

suffering" asserted against the Defaulting Defendants as the second cause of action in the Second

Amended Complaint suffers from the same pleading deficiency.  *See* Second Am. Compl. ¶¶

141-53.  Again, there is no allegation that specifies distributees who have suffered a pecuniary

loss because of Shamoya's death. Accordingly, it is reasonable to conclude that the Second Amended Complaint does not address the shortcomings identified in Your Honor's prior order dismissing Plaintiff's wrongful death claims, and that the default judgment as to liability therefore should not be interpreted to encompass any claim for wrongful death against the Defaulting Defendants. *See Henry v. Oluwole*, 108 F.4th 45, 55 (2d Cir. 2024) ("To enter a default judgment, a district court must determine whether—after taking all well-pleaded allegations as true and making reasonable inferences in the plaintiff's favor—the plaintiff's allegations establish liability as a matter of law.") (cleaned up).

At the inquest hearing, Plaintiff's counsel suggested that the wrongful death claims in the first amended complaint were only dismissed "against the City defendants"—*i.e.*, the City of Mount Vernon, the Mount Vernon Police Department, and the City's emergency services, *see* Hearing Tr. at 18:17-25—even though the basis for Your Honor's ruling on the motion to dismiss would apply equally to the purported wrongful death claim against the Defaulting Defendants.

Part of the confusion here is that the claim asserted against the Defaulting Defendants in both the first amended complaint and the Second Amended Complaint is styled as a combined cause of action for wrongful death and conscious pain and suffering, ECF No. 34-2 ¶¶ 382-91; Second Am. Compl. ¶¶ 141-53, when these are actually distinct claims under New York law. "[A] wrongful death action belongs to the decedent's distributees and is designed to compensate the distributees themselves for their pecuniary losses as a result of the wrongful act," while "a claim for conscious pain and suffering belongs to the estate of the deceased, rather than the distributees." *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 121 (2011) (quotation marks omitted); *see Lancaster v. 46 NYL Partners*, 651 N.Y.S.2d 440, 444 (N.Y. App. Div. 1996) (1st

Dep't) ("A cause of action for conscious pain and suffering is separate and distinct from one for wrongful death.").  There is no question that the claim for conscious pain and suffering is part of the default judgment as to liability.

Out of an abundance of caution, this Court will assume, for purposes of this Report and Recommendation, that the default judgment as to liability applies to Plaintiff's claims against the Defaulting Defendants for both wrongful death and conscious pain and suffering, and will separately address each of those claims here.

### 1.    Wrongful Death

Plaintiff has failed to put forward sufficient evidence to establish any entitlement to an award of damages for her wrongful death claim against the Defaulting Defendants.  Under New York's wrongful death statute, "[t]he damages awarded to the plaintiff may be such sum as . . . the court . . . deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought."  N.Y Est. Powers & Trusts L. § 5-4.3.  This limitation is equally applicable to the potential recovery of a parent who is the distributee of a deceased child.  *See Garland v. Herrin*, 724 F.2d 16, 20 (2d Cir. 1983); *accord Cerbelli v. City of New York*, No. 99-cv-6846 (ARR) (RML), 2008 WL 4449634 at *25 (E.D.N.Y. Oct. 1, 2008).  "Where the beneficiaries of the action are a decedent's parents, the pecuniary injuries include loss of their child's support and services."  *Sarullo v. State of New York*, 21 Misc. 3d 1144(A), 2008 WL 5206287, at *2 (N.Y. Ct. Cl. Nov. 21, 2008).  "Fair compensation may properly include probable, or even possible, benefits which might inure to the parents from the decedent's entire life, taking into consideration the possibility of failure or misfortune."  *Id.* (cleaned up).  "Among the factors to be considered in making an award for pecuniary damages in a death action involving a child are age, life expectancy, decedent's

earning potential, probability of means to support parents, if they are in need, and the relationship between decedent and those persons claiming to suffer pecuniary loss and the circumstances of those persons." *Moyer v. State*, 175 A.D.2d 607, 608 (N.Y. App. Div. 1991) (4th Dep't).

While the Court has no reason to doubt Plaintiff's testimony that Shamoya would have made every effort to pursue her goal of playing professional basketball in the WNBA, or Plaintiff's belief that Shamoya would have been an industrious, hard-working, adult in some capacity, there is simply not enough evidence in the record for this Court recommend an award for damages on the wrongful death claim. Plaintiff testified that Shamoya had received a scholarship to play women's basketball at the University of Connecticut, and described her dream of becoming a professional basketball player and eventually owning her own business; she also explained that Shamoya would always have wanted to take care of her family, even if that required accepting a minimum wage job. *See* Hearing Tr. at 52:11-53:18, 56:24-57:12. But the likelihood that even the most talented individuals will be able to play professional basketball is exceedingly small—indeed, based on data from 2022 and 2023, only 0.9 percent of draft-eligible women's college basketball players were chosen in the 2023 WNBA draft, and only 8.9 percent of those women played any form of professional basketball in the United States or internationally. *See* "Women's Basketball: Probability of competing beyond high school," *available at* https://www.ncaa.org/sports/2015/3/6/women-s-basketball-probability-of-competing-beyond-high-school.aspx [https://perma.cc/DXG7-3Z4Y] (last visited Nov. 7, 2024). Assessing the potential minimum wage earnings for Shamoya over her lifetime is also an entirely speculative exercise for a young woman who (understandably, given her age) never held any type of job, and Plaintiff has offered no competent evidence from an economist or other witness

to calculate the wages that Shamoya theoretically could have been expected to earn during her working years, or any basis to conclude what she would have contributed to her mother. Moreover, no evidence was presented regarding Plaintiff's financial circumstances, whether she had a reasonable expectation of future financial assistance from Shamoya, or whether she had sustained any actual pecuniary losses as a result of Shamoya's death.

In an analogous case involving an 18-year-old decedent and a dearth of evidence of regarding the plaintiff parent's pecuniary loss, a panel of the Appellate Division, Fourth Department determined that where there was no proof of the decedent's earning potential, the amounts of money given to or services provided for his mother, the relationship that he had with his mother, the financial circumstances of the mother, or any other indicators that the mother had a reasonable expectation of future assistance, the trial court did not err in finding that the plaintiff mother had suffered no pecuniary loss as the result of her son's death. *See Moyer*, 175 A.D.2d at 608. The absence of evidence in the record here compels the same conclusion. Accordingly, this Court cannot recommend an award of damages as to Plaintiff's claim for wrongful death.

## 2.    Conscious Pain and Suffering

A substantial damages award is warranted, however, for Plaintiff's claim for Shamoya's conscious pain and suffering prior to her death. "Under New York Law, 'conscious pain and suffering' is recognized as a separate cause of action that often accompanies a wrongful death claim. It refers to the decedent's injuries, pain and suffering prior to death, and can be brought by the estate." *Ocascio v. City of Canandaigua*, No. 18-cv-6712 (DGL), 2024 WL 1303850, at *7 (W.D.N.Y. Mar. 27, 2024). To establish an entitlement to relief for this claim, a plaintiff must demonstrate that the decent was conscious for some period of time following the incident that led to her death. *See Cummins v. Cnty. of Onondaga*, 84 N.Y.2d 322, 325 (1994). "When

the interval between injury and death is relatively short, the degree of consciousness, severity of

pain, apprehension of impending death, along with duration are all elements to be considered."

*Dershowitz v. United States*, No. 12-cv-8634 (SN), 2015 WL 1573321, at *38 (S.D.N.Y. Apr. 8,

2015) (quotation marks omitted).

      In determining the amount of damages to recommend, this Court looks to conscious pain

and suffering awards in other cases. *See id.* at *39. In *Dowd v. New York City Transit Authority*,

78 A.D.3d 884 (N.Y. App. Div. 2010) (2d Dep't), the plaintiff's decedent was struck by a bus,

went into cardiac arrest 18 minutes later, and, after going into cardiac arrest a second time at the

hospital, was pronounced dead 90 minutes after the accident. The jury's award for conscious

pain and suffering was reduced on appeal to $1,200,000. *Id.* at 885. In *Lubecki v. City of New

York*, 304 A.D.2d 224 (N.Y. App. Div. 2003) (1st Dep't), the plaintiff's decedent, who had been

taken hostage by a bank robber, was shot multiple times by New York City police officers and

died approximately an hour later. The jury's award to the decedent's estate for conscious pain

and suffering was reduced to $3 million by the trial court, and that amount was sustained on

appeal. *Id.* at 229-30, 238. In *Maracallo v. Board of Education of City of New York*, 2 Misc. 3d

703 (N.Y. Sup. Ct. 2003), the plaintiff's decedent drowned in an amusement park wave pool

while on a school field trip. Expert testimony established that the child likely experienced an

initial "period of fright and panic" as he attempted to come up for air, and then endured another

six to seven "terror filled" minutes, during which he was conscious and aware of his impending

death. *Id.* at 705-06, 715-16. The trial court found that "reasonable compensation" for the

decedent's conscious pain and suffering was $2 million. *Id.* at 716. Other cases have resulted in

smaller damages awards. *See, e.g.*, *Filipinas v. Action Auto Leasing*, 48 A.D.3d 333 (N.Y. App.

Div. 2008) (1st Dep't) (upholding verdict awarding $750,000 for conscious pain and suffering

where, within an hour of being struck in the head by the side mirror of the defendants' van, the decedent was "heavily medicated and/or sedated"); *Rodd v. Luxfer USA Ltd.,* 272 A.D.2d 535 (N.Y. App. Div. 2000) (2d Dep't) (upholding $300,000 damages award for conscious pain and suffering where, upon admission to the hospital 30 minutes after sustaining "severe and massive injuries" in an explosion, the decedent was "unresponsive"); *Ramos v. La Montana Moving & Storage, Inc.*, 247 A.D.2d 333, 333-34 (N.Y. App. Div. 1998) (1st Dep't) (awarding conscious pain and suffering damages of $900,000 where decedent was struck and twice run over by trailer truck, "suffered excruciating crushing injuries and lived for approximately 15 to 30 minutes, during which time he suffered extreme pain").

Plaintiff seeks an award of $2,750,000 against the Defaulting Defendants, jointly and severally.  Pl.'s Mem. ¶¶ 11-12.  The evidence establishes that after being shot, Shamoya slumped over in her seat, cried out "mommy," with blood running from her nose, and when pushed back up to a sitting position, cried out "mommy" again; she was gasping for air, with her eyes open, her head moving from side to side, and coughing up blood.  Shamoya remained in this state up through the arrival of the ambulance and her removal from the car and placement onto a stretcher.  Plaintiff asks this Court to find that Shamoya was shot at 1:00 p.m. and remained conscious until 2:42 p.m.— a total of 102 minutes.  *See id.* ¶ 7.  But taken as a whole, the evidence in the record does not support this conclusion.  While Plaintiff testified that the shooting occurred around 1:00 p.m., *see* Hearing Tr. at 26:4-10, she also testified that approximately 27-30 minutes elapsed from the time she realized Shamoya had been shot until an ambulance arrived on the scene, and another 5 to 7 minutes passed before the ambulance pulled up to where Shamoya was, *id.* at 40:4-41:13.  This testimony indicates that it was approximately

32-37 minutes from the time Shamoya was shot until the ambulance arrived and medical personnel began attending to her.

The Empress records indicate that the ambulance got to Shamoya at 2:30 p.m., Empress Records at p. 1, and at her initial assessment at 2:31 p.m., Shamoya was found to have "no abnormalities" in her pulses, motor function, and neurological function, *id.* at p. 2.  But at 2:34 p.m. (*i.e.*, four minutes after the ambulance arrived), and again at 2:44 p.m., Shamoya's level of consciousness was "unresponsive."  *Id.* at p. 3.  There is no evidence that Shamoya was conscious at any point after 2:34 p.m.  Adding the four minutes between 2:30 and 2:34 p.m. to the 32-37 minutes that passed between the shooting and the ambulance's arrival at Plaintiff's car leads to the conclusion that Shamoya's conscious pain and suffering lasted a total of 36-41 minutes, which is consistent with the gravity of the injury and Plaintiff's severely compromised condition prior to her death.[8]  This is also consistent with Plaintiff's testimony that it was approximately 30 to 45 minutes from the time Shamoya was shot to the time she was taken from the scene of the shooting by ambulance.  Hearing Tr. at 38:19-39:6.

---

[8] To be clear, this Court found Plaintiff's testimony at the inquest hearing to be highly credible, which is why this Court largely has relied on Plaintiff's estimated timeline of the events of December 31, 2016.  The fact that there is an inconsistency in Plaintiff's recollection as to whether the shooting took place at approximately 1:00 p.m. or approximately 2:00 p.m. does not undermine this credibility finding, particularly in light of the extraordinary trauma of that day.

When adjusted for inflation,[9] the cases described above resulted in awards of

approximately $551,000 (*Rodd*), $1,117,000 (*Filipinas*), $1,729,000 (*Dowd*), $1,753,000

(*Ramos*), $3,421,606 (*Maracallo*), and $5,135,000 (*Lubecki*).  Based on the specific facts in the

record, including the duration of Shamoya's consciousness, her crying out for her mother, and

her gasping for air and coughing up blood, an award that falls within the range of awards made

in these cases would be appropriate.  This case does not involve the substantial period of fear of

impending death that existed in *Maracallo* and *Lubecki*, which supported the exceptionally high

damages awards for conscious pain and suffering in those matters.  Shamoya was struck by a

bullet without any warning or knowledge beforehand; in contrast, in *Maracallo*, the decedent

struggled to come up for air while knowing that he was going to drown, and in *Lubecki*, the

---

[9] Given the age of some of the comparable cases discussed in this section, this Court has used the U.S. Department of Labor, Bureau of Labor Statistics Consumer Price Index Inflation Calculator at http://www.bls.gov/data/inflation_calculator.htm [https://perma.cc/8SAP-4L9Y] (last visited Nov. 7, 2024), to adjust the awards in those cases for inflation for purposes of comparison.  *See Ravina v. Columbia Univ.*, No. 16-cv-2137 (RA), 2019 WL 1450449, at *13 n. 5 (S.D.N.Y. Mar. 31, 2019) ("The Court has taken into account inflation when comparing Ravina's award to the compensatory damages awards upheld in prior cases."); *Dancy v. McGinley*, No. 11-cv-7952 (LMS), 2015 WL 13214324, at *2 (S.D.N.Y. May 11, 2015) ("It is also appropriate for the court to adjust for inflation when comparing verdicts and remittitur orders in prior cases.").  The appellate court's decision in *Dowd*, *supra*, issued in November 2010, approved an award of $1.2 million for conscious pain and suffering, which is the equivalent of $1,729,232.23 in September 2024 dollars, the latest month for which such data is available.  The appellate court's decision in *Lubecki*, *supra*, issued in March 2003, approved an award of $3 million for conscious pain and suffering, which is the equivalent of $5,135,195.44 in September 2024 dollars.  The trial court's decision in  *Maracallo*, *supra*, issued in December 2003, accepted an award of $2 million for conscious pain and suffering, which is the equivalent of $3,421,606.08 in September 2024 dollars.  The appellate court's decision in *Filipinas*, *supra*, issued in February 2008, approved an award of $750,000 for conscious pain and suffering, which is the equivalent of $1,117,069.29 in September 2024 dollars.  The appellate court's decision in *Rodd*, *supra*, issued in May 2000, approved an award of $300,000 for conscious pain and suffering, which is the equivalent of $551,546.94 in September 2024 dollars.  Lastly, the appellate court's decision in *Ramos*, *supra*, issued in February 1998, approved an award of $900,000 for conscious pain and suffering, which is the equivalent of $1,752,754.17 in September 2024 dollars.

decedent was held hostage and then caught in the crossfire of a shootout with police, knowing that she was almost certainly going to be shot. At the same time, as detailed above, Shamoya suffered severe pain and discomfort for approximately 40 minutes before losing consciousness. Taking all of these considerations into account, an award on the higher end of the range of awards approved in the other cases cited above which did not involve as drastic a period of apprehension of impending death—such as the awards in *Dowd* and *Ramos*—is warranted. Accordingly, this Court recommends an award of $1,750,000 in compensatory damages for Plaintiff's claim for Shamoya's conscious pain and suffering.

### 3.    Punitive Damages on Conscious Pain and Suffering Claim

Plaintiff is also entitled to an award of punitive damages in connection with the claim for Shamoya's conscious pain and suffering. "The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant for wanton and reckless [or] malicious acts and thereby to discourage the defendant and other people . . . from acting in a similar way in the future." *In re 91st Street Crane Collapse Litig.*, 154 A.D.3d 139, 156 (N.Y. App. Div. 2017) (1st Dep't) (cleaned up). "Because the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases, the conduct justifying such an award must manifest spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful [*sic*] or wanton." *Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 511 (2013) (quotation marks omitted). "Although the factfinder has discretion to determine whether to award punitive damages and, if so, in what amount, punitive damages must bear some reasonable relation to the harm done and the flagrancy of the conduct causing it." *Wright v. Musanti*, No. 14-cv-8976 (KBF), 2017 WL 253486, at *13 (S.D.N.Y. Jan. 20, 2017) (cleaned up), *aff'd*, 887

F.3d 577 (2d Cir. 2018). Ordinarily, "no matter how egregious the underlying conduct, the court is required to consider the defendant's financial circumstances in determining an award of punitive damages." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 101 (E.D.N.Y. 2020) (citing *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006) (noting that courts "must also consider" a defendant's "personal financial situation")). But where, as here, a defendant has defaulted, he or she "surrender[s] the opportunity to demonstrate that his [or her] financial circumstances should constrain the amount of any such [punitive damages] award." *Id.* at 102.

"Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his [or her] misconduct." *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). "There is no 'simple mathematical formula' to determine the amount of a punitive damages award." *Francis v. City of New York*, No. 15-cv-7997 (VSB) (KHP), 2019 WL 8918743, at *9 (S.D.N.Y. Nov. 12, 2019) (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 582 (1996)), *adopted by* 2020 WL 2792995 (S.D.N.Y. May 29, 2020). "Any punitive damages award must be reasonable and rational in light of its purpose to comport with due process." *Id.* "In the context of evaluating whether a jury award of punitive damages is excessive, the Supreme Court has set forth three guideposts to be considered: 1) the degree of reprehensibility of the defendant's conduct, 2) the disparity between the punitive damages award and the harm caused to the plaintiff, and 3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* (quotation marks omitted); *see Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 104-05 (2d Cir. 2024).[10] "Whether these same

---

[10] These considerations, which were set forth by the United States Supreme Court in *BMW of North America v. Gore*, 517 U.S. 559, 574-75 (1996), are commonly referred to as the "*Gore* factors."

considerations apply in the context of a post-default damages inquest is not settled in this District." *Francis*, 2019 WL 8918743, at *9 (collecting cases). Courts have "reconciled the different approaches" by determining that

> the assessment of punitive damages at inquest should begin with an understanding of the range of damages awarded in comparable cases after trial (and after any remittiturs), as well as an analysis of any features that distinguish the case at bar. The *Gore* factors can then be utilized, if necessary, to ensure that the proposed award is not grossly excessive.

*Id.* (quoting *Poulos v. City of New York*, No. 14-cv-03023 (LTS) (BCM), 2018 WL 3750508, at *6 (S.D.N.Y. July 13, 2018)), *adopted by* 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018)). This Court agrees with this methodology.

Plaintiff's counsel did not identify, and this Court has not located, any cases where punitive damages were awarded in a precisely analogous context—the death of an innocent bystander as the result of a criminally reckless shooting. Instead, this Court must rely on other cases where punitive damages have been awarded in situations where defendants were found liable for similarly contemptible conduct that led to tragic results.

In *In re 91st Street Crane Collapse Litigation*, *supra*, consolidated wrongful death actions stemming from a catastrophic crane collapse, the defendants became aware of a crack in a critical component of the crane before the crane was used at the construction site at issue, and knew that failure of this part "would have catastrophic results, creating a mortal risk to the operator, other workers, and the general public." 154 A.D.3d at 144-45. The defendants took a series of actions that led to a defective replacement being used for this part, and the defective part was found to have caused the crane to collapse. *Id.* at 149-50. The appellate court noted that there were no cases with similar facts, *i.e.*, "catastrophic injuries leading to death, and egregious, wanton disregard for potential loss of life and property." *Id.* at 153. In evaluating

punitive damages, the panel explained that while the defendants "may not have intended to cause plaintiffs' decedents' deaths, these deaths nevertheless arose from a series of calculated decisions made . . . over a period of months . . . ." *Id.* at 156. Considering the purpose of punitive damages, as well as the defendants' wealth, and the *Gore* factors, the appellate court reduced the punitive damages awards to $8 million for one plaintiff and $9.5 million for another plaintiff. *Id.* at 157-58. The ratio of the punitive damages awards approved by the appellate court to the combined pre-impact terror and conscious pain and suffering awards approved by the appellate court was 1:1 for both plaintiffs. *Id.* at 158-59.

In *Guariglia v. Price Chopper Operating Company, Incorporated*, 38 A.D.3d 1043 (N.Y. App. Div. 2007) (3d Dep't), a wrongful death action in which a two-year-old child died after ingesting drugs that had been left unsecured in a duffel bag by the mother's boyfriend (a pharmacist who pled guilty to criminally negligent homicide), the appellate court upheld a punitive damages award of $750,000. *Id.* at 1044. This figure was "less than three times the amount awarded for the actual harm suffered by plaintiff and the child," and the appellate court determined this to be an "acceptable ratio." *Id.*

In *Espinal v. Vargas*, 2011 WL 4433183 (N.Y. Sup. Ct. June 2, 2011), a case involving a single vehicle collision in which the passenger died and the driver was arrested and charged with driving under the influence, criminally negligent homicide, and second-degree vehicular manslaughter, the jury awarded $250,000 for the decedent's pain and suffering and $275,000 in punitive damages.

Finally, in *Noonan v. Becker*, No. 14-cv-4084 (LTS) (JLC), 2018 WL 1738746 (S.D.N.Y. Apr. 10, 2018), *adopted by* 2018 WL 2088279 (S.D.N.Y. May 3, 2018), the court, after conducting an inquest on damages, awarded $1,013,000 in compensatory damages for emotional

distress, physical harm, and out-of-pocket expenses, and $1,000,000 in punitive damages. There, as here, the defendant, who was a police officer, had defaulted, and liability had been deemed established on claims including, among other things, sexual assault. Based on the case law in other sexual assault cases, the court found that a one-to-one ratio of compensatory to punitive damages was appropriate. *Id.* at *8-9.

In addition to reviewing these comparable cases, this Court has considered the *Gore* factors. As to the first *Gore* factor, there is no question that the Defaulting Defendants' conduct in this case evinces a high degree of reprehensibility, which is "'perhaps the most important' factor in assessing a punitive damage award." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Gore*, 517 U.S. at 575). In assessing reprehensibility, "[a]ggravating factors include (1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Id.* Here, the aggravating factors lead to the conclusion that the Defaulting Defendants' conduct warrants a significant award of punitive damages. While there is no information in the record regarding whether the Defaulting Defendants have engaged in prior misconduct, their misconduct in this case was both violent and malicious—the discharge of a deadly weapon on a city street in the middle of the day without any regard for the potential loss of life.

With respect to the second *Gore* factor, which takes into account the appropriate ratio between punitive and compensatory damages, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred." *Gore*, 517 U.S. at 581. Plaintiff here seeks punitive damages of $16.5 million—a 6:1 ratio when measured against her

requested conscious pain and suffering award, *see* Pl.'s Mem. ¶ 27, and a 9.14:1 ratio when

compared to this Court's recommended award of compensatory damages.  Plaintiff does not

propose any apportionment of this total amount among the Defaulting Defendants, however, and

while liability among defendants for compensatory damages is joint and several, liability for

punitive damages is individual.  *See Rodick v. City of Schenectady*, 1 F.3d 1341, 1349 (2d Cir.

1993) (joint and several liability does not apply to punitive damages); *see also Magalios v.

Peralta*, No. 19-cv-6188 (CS), 2022 WL 407403, at *5 (S.D.N.Y. Feb. 10, 2022)

("compensatory damages are not calculated defendant-by-defendant, but punitive damages are"),

*aff'd*, 2023 WL 4618349 (2d Cir. July 19, 2023) (summary order).

    Courts have taken different approaches to evaluating punitive damages ratios "where, as

here, defendants are jointly and severally liable for compensatory damages but individually

liable for separate amounts of punitive damages."  *Magalios*, 2022 WL 407403, at *5 (collecting

cases).  In *Magalios*, for each individual defendant, the Court compared the punitive damages

award assessed by the jury for that defendant with the total compensatory damages award

imposed against all defendants, which yielded ratios of 7:1, 7:1, and 5:1; those awards were then

remitted by the Court, with resulting ratios of 4:1, 4:1, and 2:1, respectively.  *Id.* at *5, *7.  In

contrast, for example, in *Anderson v. Osborne*, Your Honor assessed the jury's punitive damages

awards by comparing the total amount the punitive damages awards assessed against the

individual defendants with the total compensatory damages award; this yielded a ratio of 7.61:1,

which Your Honor approved.  *See* No. 17-cv-539 (VB), 2020 WL 6151249, at *8 (S.D.N.Y. Oct.

20, 2020).  Your Honor also noted that "the ratio of punitive damages to compensatory damages

for each individual defendant"—*i.e.*, comparing the figures in the same manner as in *Magalios*—

"is less than 4:1 in each case."  *Id.*

While the Supreme Court has declined to "impose a bright-line ratio which a punitive damages award cannot exceed," it has noted that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). The Supreme Court added that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Because this Court recommends a substantial compensatory damages award for Plaintiff's conscious pain and suffering claim, a lesser ratio of compensatory damages to punitive damages for each defendant is warranted.

Finally, with respect to the third *Gore* factor, this Court has taken into account comparable cases, discussed above, in deciding what would be an appropriate punitive damages award in this case. In those cases, which all involved substantial compensatory damages awards, the punitive damages awards ranged from the same amount as the compensatory damages award to less than three times the amount of the compensatory damages award.

Based on the foregoing, and taking into account all of the relevant considerations—including the purpose of punitive damages, comparable cases, and the *Gore* factors—this Court recommends awards of punitive damages of $2,625,000 as against Defendant Hardy (who, according to paragraph 48 of the Second Amended Complaint, was the shooter), $1,750,000 as against Defendant Collier, $1,750,000 as against Defendant Hughley, and $1,750,000 as against Defendant Savoy. Using the *Magalios* method—that is, comparing the recommended punitive damages figure for each defendant individually against the total recommended compensatory damages award—results in a ratio of punitive damages to compensatory damages of 1.5:1 for Hardy, and 1:1 for each of the other Defaulting Defendants, which is plainly reasonable and

consistent with due process.  Meanwhile, using the *Anderson* method—that is, comparing the total amount of recommended punitive damages to the total amount of recommended compensatory damages—yields a ratio of 4.5:1, which is also reasonable and consistent with due process in this case.  "Although courts have held that a 4:1 ratio might be close to the line of constitutional impropriety, a ratio higher than 4:1 may comport with due process in cases where a particularly egregious act at issue does not appear to have been measured within the awarded compensatory damages."  *Anderson*, 2020 WL 6151249, at *8 (quotation marks omitted); *see Gilead Cmty. Servs.*, 112 F.4th at 104-06 (reducing jury award of punitive damages, which amounted to a punitive to compensatory ratio of 27.6:1, to $2 million, which amounted to a punitive to compensatory ratio of 11:1).  Here, not only would the ratio calculated under the *Anderson* methodology be barely beyond 4:1, but the Defaulting Defendants' conduct was unquestionably egregious and deserving of substantial monetary sanction.

## B.     Assault and Battery

In her inquest submission, Plaintiff has not requested a separate award of damages for her claim for assault and battery.  This is appropriate, as any damages for assault and battery would be duplicative of the damages recommended for Shamoya's conscious pain and suffering.  Accordingly, this Court does not recommend a separate award of damages for this cause of action.

## C.     Post-Judgment Interest

Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  The Second Circuit has held that an award of post-judgment interest is "mandatory" and should be awarded at the statutory rate prescribed by section 1961.  *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (citing *Westinghouse*

*Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004)).  Moreover, "[t]he amount upon which the post-judgment interest accrues includes compensatory damages, punitive damages, and fee awards."  *Antoine,* 489 F. Supp. 3d at 102 (quotation marks omitted).  This Court therefore recommends that post-judgment interest be calculated on the total damages amount.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Plaintiff be awarded damages for the claim for Shamoya's conscious pain and suffering as follows: (1) $1,750,000 in compensatory damages as against all the Defaulting Defendants, jointly and severally; and (2) punitive damages of $2,625,000 as against Defendant Hardy, $1,750,000 as against Defendant Collier, $1,750,000 as against Defendant Hughley, and $1,750,000 as against Defendant Savoy, plus post-judgment interest on the $9,625,000 total pursuant to 28 U.S.C. § 1961.  This Court respectfully declines to recommend an award of damages for Plaintiff's claim for wrongful death or her claim for assault and battery.

**Plaintiff must serve each of the Defaulting Defendants with a copy of this Report and Recommendation, including copies of any decisions cited herein that are only available via electronic databases, at their last known addresses,[11] and must file appropriate proof of service on or before November 26, 2024.**

## NOTICE

Pursuant to 28 U.S.C § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have 14 days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made

---

[11] To determine the current addresses of the Defaulting Defendants, Plaintiff must use the "inmate locator" website maintained by the federal Bureau of Prisons— https://www.bop.gov/inmateloc/.

by mail).  A party may respond to another party's objections within 14 days after being served

with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any responses to such objections,

must be filed with the Clerk of Court with courtesy copies delivered to the chambers of the

Honorable Vincent L. Briccetti, United States District Court, Southern District of New York, 300

Quarropas Street, White Plains, New York, 10601, and to the chambers of the Honorable

Andrew E. Krause at the same address.

Any request for an extension of time for filing objections or responses to objections must

be directed to Judge Briccetti, and not to the undersigned.

**Failure to file timely objections to this Report and Recommendation will result in a**

**waiver of objections and will preclude appellate review.**  *See Thomas v. Arn*, 474 U.S. 140

(1985); *Smith v. Campbell*, 787 F.3d 93, 102 (2d Cir. 2015).

Dated: November 12, 2024
      White Plains, New York

                                      Respectfully submitted,

                                       _____

                                       ANDREW E. KRAUSE
                                       United States Magistrate Judge